Jeffrey J. Toney (*admitted pro hac vice*)
jtoney@kasowitz.com
Ralph E. Gaskins (*admitted pro hac vice*)
rgaskins@kasowitz.com
Paul G. Williams (*admitted pro hac vice*)
pwilliams@kasowitz.com
KASOWITZ BENSON TORRES LLP
1349 West Peachtree Street NW, Suite 1500
Atlanta, Ga 30309
Telephone:  (404) 260-6080
Facsimile:  (404) 260-6081

Lyn R. Agre (SBN 178218)
lagre@kasowitz.com
Margaret A. Ziemianek (SBN 233418)
mziemianek@kasowitz.com
KASOWITZ BENSON TORRES LLP
101 California Street, Suite 2300
San Francisco, California  94111
Telephone:  (415) 421-6140
Facsimile:  (415) 398-5030

Attorneys for Plaintiff RIDEAPP, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIDEAPP, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>LYFT, INC.<br><br>                    Defendant. | Case No.  3:18-CV-07152-JST<br><br>**SECOND AMENDED COMPLAINT** |

In 1999, Georgia Tech Engineering Professor Stephen Dickerson conceived of a passenger-centric transportation system to provide greater convenience and service to customers, and to reduce the social and personal costs of commuting.  His system integrated cell phones, the Global Positioning System, and automatic billing technology to allow a passenger who needed a ride to be connected to various methods of transportation to complete a desired trip, including an available driver and direct access to different types of shared vehicles.  The system he envisioned

would identify the passenger to the driver or vehicle and vice versa, estimate connection and arrival times, and automatically bill the passenger in a safe and secure manner that required no cash to change hands.

In April 2000, he filed an application for a patent on the transportation system he invented. He was awarded U.S. Patent No. 6,697,730 (the "'730 Patent") to protect his ideas, and he later incorporated RideApp ("RideApp" or "Plaintiff") to develop that transportation system.

Over a decade after Professor Dickerson filed his patent application, in 2012, defendant Lyft, Inc. ("Lyft") was formed.  As explained herein, the core of Lyft's business and technical platforms, for its rideshare and bikeshare services practice the transportation system of Professor Dickerson's invention; without that system, Lyft literally cannot operate.  Throughout its existence, Lyft has egregiously infringed the '730 Patent without paying any compensation to Professor Dickerson, despite earning up to $1 billion in annual revenue.  Professor Dickerson seeks that compensation through this lawsuit.

A.      **NATURE OF ACTION**

1.      This is an action for patent infringement under the patent laws of the United States, Title 35 of the United States Code, arising from Defendant's infringement of one or more claims of United States Patent No. 6,697,730 (the "'730 Patent") (a true and correct copy is attached hereto as Ex. A).

B.      **PARTIES**

2.      Plaintiff RideApp, Inc. ("RideApp") is a company organized and existing under the laws of the State of Delaware with a place of business at 227 Sandy Springs Place, Suite D-273, Sandy Springs, Georgia 30328.  RideApp is involved in the commercial implementation of the '730 Patent to reduce the social costs of traffic congestion and inefficient travel, as more fully described below.

3.      Defendant Lyft, Inc. ("Lyft") is a company organized and existing under the laws of the State of Delaware but with a principal place of business at 185 Berry Street, Suite 5000, San Francisco, CA 94107.  Lyft's agent for service of process is CT Corporation System, 818

- 2 -

West Seventh Street, Suite 930, Los Angeles, CA 90017.  Lyft is a publicly-traded, for-profit corporation that provides on-demand transportation services to individuals.

**C.  JURISDICTION AND VENUE**

4.  This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.  This Court has personal jurisdiction over the Defendant because, *inter alia*, Lyft maintains a regular and established place of business in this judicial district, Lyft transacts business in this district and has sufficient minimum contacts within the forum as a result of its business conducted within this judicial district.  Defendant also has engaged in infringing conduct within or directed at this district.

6.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

**D.  FACTS AND BACKGROUND**

**1.  Professor Dickerson Invented A Coordinated Transportation System To Minimize The Social Costs Of Traffic Congestion, Which He Patents.**

7.  Professor Stephen Dickerson received his Sc.D. degree from MIT in 1965.  He was then hired as an Assistant Professor at Georgia Institute of Technology ("Georgia Tech") in the George W. Woodruff School of Mechanical Engineering.  Prof. Dickerson developed the first commercially available vanpools in the Atlanta area in 1975.  Prof. Dickerson retired from Georgia Tech as a Professor Emeritus in 1996.

8.  In approximately August 2006, Professor Dickerson donated $1.5 million in proceeds from another invention to Georgia Tech to endow a chair in urban transportation for a professor to study and develop further transportation solutions.

9.  Around the time of his invention, Prof. Dickerson had serious concerns about the social costs of urban transportation, such as traffic congestion, environmental impacts, costs of and impact on infrastructure, travel time and uncertainty, and high costs of individual transportation borne by families.  Indeed, during this period, the city of Atlanta was undergoing

- 3 -

explosive growth, with the increasingly negative effects of traffic usually attendant to such rapid expansion.  Over a decade before companies like Lyft began operations, Professor Dickerson was a pioneer in developing the radical idea of what we have come to know as ride- and vehicle-sharing services.

10.    Prof. Dickerson invented an automated transit system that uses wireless, hand-held devices to hail vehicles; includes integrated global positioning system (GPS or other wireless locating technology, collectively "GPS"  (*see, e.g.*, '730 Patent at col. 5 ll. 13-15; col. 11 ll. 42-48)); provides matching and billing for rides; provides for an automated, cash-free transaction; and, with respect to automobiles, advises both the driver and the passenger of each other's GPS location and the time at which a driver is anticipated to arrive, and with respect to shared vehicles, advises the user of the availability and location of the vehicle.

11.    Professor Dickerson is listed as the sole inventor of the '730 Patent.

12.    On February 24, 2004, the United States Patent and Trademark Office ("USPTO") issued the '730 Patent, entitled "Communications and Computing Based Urban Transit System." The application that issued as the '730 Patent was filed on April 4, 2001, with priority claimed to a provisional patent application U.S. Ser. No. 60/273,286, also entitled "Communications and Computing Based Urban Transit System" (filed on March 1, 2001) and originally to U.S. Ser. No. 60/194,416, entitled "Communications and Computing Based Urban Transit System" (filed on April 4, 2000).

13.    As a faculty member of Georgia Tech, Professor Dickerson was initially obligated to assign his '730 Patent to the Georgia Tech Research Corporation, and this assignment was recorded by the USPTO on April 4, 2001.  The Georgia Tech Research Corporation made no effort to enforce the '730 Patent against any infringing parties during the time that it held the patent by assignment.

14.    In early 2018, then retired but still interested in pursuing further development of the claimed technology, Professor Dickerson was able, in discussions with the Georgia Tech Research Corporation, to have the '730 Patent assigned back to him.  This was accomplished in

SECOND AMENDED COMPLAINT
CASE NO. 3:18-CV-07152-JST

an assignment recorded on February 20, 2018, with a corrected assignment subsequently recorded on April 26, 2018.  Professor Dickerson subsequently assigned the '730 Patent to his newly formed transportation company, RideApp, Inc., with a recording date of May 7, 2018 in the USPTO.

15.     RideApp is the current owner by assignment of all right, title, and interest in and to the '730 Patent and has standing to sue for the past, present, and future infringement of the '730 Patent.  The claims of the '730 Patent are valid and enforceable.

**2.     Professor Dickerson Invented A System That Integrated Location Technology And Provided For Secure, Automated Allocation And Billing.**

16.     The claims of the '730 Patent are directed to an improved transit system that uses wireless communication devices, novel and specific allocation and billing processes, passenger and driver location, and dynamic updating and tracking to (1) reduce wait times, (2) reduce transit time uncertainty, (3) minimize vehicle backtracking, (4) provide real-time communication among the passenger, driver, and system, (5) provide a convenient automated payment system for both driver and passenger, and (6) provide enhanced passenger and driver security.  The system of his invention successfully addressed many of the social costs associated with the then-existing transportation system.   Prof. Dickerson's invention improved the area it targeted—transit systems—and revolutionized the industry.

17.     As set forth in the '730 Patent, the transportation systems of April 2000 imposed enormous economic and social costs.  The transportation systems of the time were singular sources of air, water and noise pollution.  Personal transportation was also expensive in a unique way:  the costs of purchasing, maintaining, owning, operating, and insuring motor vehicles were a serious burden on most of society, and was so inefficient that, by some estimates, most passenger vehicles sat, idle and unused, more than 90% of the time.  All of the above rested on the costs associated with building and maintaining infrastructure:  highways, parking spaces, and a fuel infrastructure.  ('730 Patent at col.1 l.31-col.2 l.6.)

18.     Mass transit systems impose many of the same costs.  Further, mass transit imposes high costs of installation, particularly rail systems, which are extremely expensive to install in highly populated areas, if the necessary land and easements can even be obtained, and extremely difficult to use in less populated areas.  Further, such systems inevitably have widely-spaced travel schedules, inefficiencies, and uncertainties that make use by many consumers inefficient and time-prohibitive.  ('730 Patent, col.2 ll.7-51.)

19.     At the time of Professor Dickerson's invention, time uncertainty and long wait times were serious problems with transit systems.  Transit systems at that time, including taxi and limo dispatch, consisted of calling a dispatch company operator and waiting for a vehicle to arrive at a specified location.  Alternately, when using mass transit such as buses or trains, the passenger would wait at a fixed location, such as a bus stop.  In none of these systems did the passenger have a means of determining when the transit vehicle would actually arrive or of determining where it was located.  It was a common problem at the time of the invention for a passenger to have to wait in the dark while not knowing whether the summoned taxi, limo, or a bus on a designated route was near—or even if it was coming at all.  (*See, e.g.*,'730 Patent  at col.7 ll.15-19 ("[U]nder current situations most operate on fixed time schedules because passengers are without cell phones according to the present system, and must depend on portable time pieces (watches) and predetermined, but perhaps unreliable, schedules.").)

### 3.     Professor Dickerson Anticipated Regulatory And Technological Advances.

20.     As of April 2000, the regulatory and technical landscape was challenging but evolving.  Technologists at the time looked to cellphones and GPS to facilitate transportation improvements, and there are references to those attempts in the prior art.  Cellphones were not "smart phones" in the modern sense.  And cellphone usage was largely limited to the geography that the particular carrier supported, that is, where the carrier had erected its own towers.

21.     Some prior artisans looked to the GPS system to track, for example, delivery trucks, but that was not a practical technology for the passenger to use.  They also looked to the

- 6 -

GPS system to determine mass transit vehicle arrival times, and therefore scheduling.  GPS receivers were only receivers— they could not transmit radio signals.  The receivers were bulky, as were their antennae, and used enormous amounts of power.  To acquire GPS signal, the antennae needed a clear view of the sky and several minutes to acquire the satellite signals.

22.    In 2000 GPS was also imprecise.  It could reliably determine location to within 300+ meter radius.  In fact, the United States Air Force, which controls the GPS system, intentionally degraded GPS accuracy for civilian uses worldwide (so called "Selective Availability").  (*See* Ex.  P,  "GPS  Accuracy,"  (available  at https://www.gps.gov/systems/gps/performance/accuracy/ (last accessed June 11, 2019)).)

23.    The cellphone system itself allowed "crude" location abilities, as noted in the '730 Patent, but it was no more precise than GPS at the time.  ('730 Patent at col.11 ll.43-55.)

24.    In 2000 it was known that the cellphone system was soon going to allow for location and tracking of cellphones with precision.  The Wireless Communications and Public Safety Act of 1999 required cellphone carriers to provide for precise locations of cell phones such that emergency response systems could locate and respond.  And the month after Professor Dickerson filed his patent application, the president signed an order essentially ending Selective Availability.  (*See* Ex. P.)

### 4.    Professor Dickerson's Solution Was To Invent The Unified Billing and Transportation System Described In The '730 Patent.

25.    Professor Dickerson's invention includes an innovative combination of hardware and software designed to implement all aspects of his novel and improved transit system, including a wireless means of "allocation"[1], a specific software solution, "location" technology, cellphones, and a unique "central assignment system" (which he calls a "central data system" when it is further enhanced with a database containing passenger parameters.)  (*See, e.g.*, '730 Patent at Figure 2; col.7 l.65 -col.8 l.7; Table 1, col.21-22.)  Unlike any transit system before it, this system monitors <u>both</u> the passenger and vehicle information and provided communications with each to allow for more precise times of pickup; dynamically updates schedules, routes, and loading; alerts the passenger and driver of the other's location and/or ETA; detects the proximity

- 7 -

of the passenger and alerts the passenger of the proximity of the car; and provides automatic cash-free, credit-card-free billing/invoicing. (*See* '730 Patent at col.7 ll.47-64; col.14 ll.29-40; Table 1, col.21-22) ("Notify Passenger", "Updates"; "Report Position"); col.23 ll.30-33.)  These novel features are reflected in the '730 Patent's claims.  (*See, e.g.*, '730 Patent, Claim 2(b) ("a plurality of communication devices for providing wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation usage"); Claim 6(c) ("a wireless means of detecting the proximity of the passenger and alerting the passenger of the proximity of the vehicle"); Claim 3(d) ("a wireless means of informing the passenger of the assignment and updated expected arrival time"); Claim 2(a) ("a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage");  *see also* Claim 3(b); Claim 6(b).)  The use of wireless communication devices for communication among drivers, passengers, and a central data system was not routine or conventional in circa-2000 transit systems, nor was this feature well-known in the industry.  Never before had on-demand transit been available with the push of a button on a handheld, wireless device.  Never before had a transit system offered dynamic scheduling and tracking of proximity and ETA – not only of the vehicle, but of the passenger; these capabilities likewise were not routine or conventional.

26.     The specification of the '730 Patent explains in detail how long passenger wait times and time uncertainty were problems with prior art transit systems, providing several examples of how the claimed invention solved these problems.  (*See, e.g.*, '730 Patent at col.2 ll. 23-25 ("One reason for this inefficiency is that fixed bus routes are so tied to traffic that it is virtually impossible to maintain a satisfactory schedule."); col.3 ll.25-31 ("Conventional ride-sharing and bus-rail transit have poor performance relative to the expectations of the public, primarily because of the perceived extensive total travel time and uncertainty in the trip time (mainly a function of uncertainty in vehicle arrival times").); col.6 ll.17-20 ("The present transit system provides other advantages over the prior art, including among others, the ability to make trip time uncertainty (including waiting times), in the order of a few minutes"); col.7 ll.15-19 ("[U]nder current situations most operate on fixed time schedules because passengers are without

- 8 -

cell phones according to the present system, and must depend on portable time pieces (watches) and predetermined, but perhaps unreliable, schedules."); col.7 ll. 62-64 ("Waiting time for trips is known to have a particularly high social penalty for passengers.  Similarly, uncertainty of times has a particularly high social penalty."); col.8 ll. 19-22 ("It is another object of the present invention to provide a more efficient and effective route assignment process that minimizes vehicle backtracking and makes the most efficient use of the vehicles which service transit requests."); col.8 ll.22-27 ("It is another object of this invention to minimize uncertainty and wait times associated with shared-ride, mass transit, and car rental…"); col.11 ll.63-65 ("The system monitors the locations of all vehicles in order to provide accurate, real-time information on when a passenger will be picked up."); col.14, ll.33-40 ("The central assigning system can communicate updated passenger and vehicle information directly to vehicles and drivers…As people approach the vehicle, the central assigning system can verify that expected persons are present based on received location data of passengers and vehicles."); col.15 ll.41-43 ("The system in step 512 then updates the pickup times for that reservation as it dynamically updates with new vehicle and passenger information"); col.16 ll.1-2 ("the system will notify the passenger with updates"); col.16 ll.22-23 ("The central assigning system updates the vehicle with real-time traffic situations and updated passenger pick up needs."); Abstract ("real-time command and control of passengers and vehicles"); Table 1, "Report Position"; Claim 2(c) ("a wireless means of on-demand allocation of a passenger to a specific vehicle through the central data system"); Claim 3(d) ("a wireless means of informing the passenger of the assignment and updated expected arrival time"); Claim 6(c) ("a wireless means of detecting the proximity of the passenger and alerting the passenger of the proximity of the vehicle.").)

27.    The '730 patent's novel "allocation" process also provides a solution to the long passenger wait times and time uncertainty problems described in the specification.  The claimed "allocation" is a function of the wireless communication devices, interfaced with the central assigning system and a database, in which, at least, a passenger is assigned to a vehicle, and vice versa, based on current passenger information (including passenger parameters, whether saved on

- 9 -

the central assigning system or dynamically entered by the passenger), current transit parameters, and current vehicle data.  (*See, e.g.*, '730 Patent col.14, ll.4-13 & FIGS. 5 & 6 ("[T]he central assigning system processes the trip request received from the passenger.  The central assigning system integrates information automatically transmitted from the passenger[']s communication device or information.  The automatically transmitted information is information that need not be specifically entered and transmitted by the passenger.  Exemplary transmitted data includes but is not limited to location data, passenger specific data such as travel preferences and billing preferences.")

28.    The allocation process is reflected in the '730 Patent's claims.  (*See, e.g.*, '730 Patent, Claim 2(c) ("a wireless means of on-demand allocation of a passenger to a specific vehicle through the central data system."); *see also* Claim 3(c).  Because of the invention's unique allocation process, passengers know when their vehicle is close, and uncertainty regarding wait times is reduced.

29.    The '730 patent's novel allocation system was inventive and not routine, conventional, or well-known in the industry.  No prior art system used location technology for both the passenger and driver to allow for such an allocation process.  Even New York taxicabs were not fitted for GPS until 2004.  (*See* Ex. C, *The Appeals Court Ruled that The City Can Monitor Taxis with GPS*, YellowCabNYC.com, Sept. 1, 2016, (available at https://www.yellowcabnyctaxi.com/blog/appeals-court-rules-city-can-monitor-taxis-movements-with-gps) ("New York Taxicabs were fitted for GPS back in 2004…"); *see also* Ex. D, Annie Karni, *Cabbies May Strike to Protest Mandatory GPS* Systems, The Sun, Aug. 24, 2007, (available at https://www.nysun.com/new-york/cabbies-may-strike-to-protest-mandatory-gps/61245/).)  In fact, no prior art system used a novel allocation process like the one in Professor Dickerson's invention, where locating technology used both passenger and driver location in the allocation process.  As of 2000, GPS had only been incorporated into a single cell phone—the Benefon ESC! (sold in Europe)—and the idea of incorporating it into a transit system was forward-thinking, to say the least.  In inventing a transit system integrating GPS and cell phones,

1  Dr. Dickerson saw something that, at the time, no one else saw. No transit system at the time of

2  the invention incorporated "digital cellular communication, GPS locating technology, and digital

3  computers to provide real-time command and control of passengers." ('730 Patent at col.1 ll.18-

4  21.)

5      30.    The specification of the '730 Patent explains in detail how the invention of the

6  '730 Patent provides a solution to security problems inherent in prior art transit systems, providing

7  several examples of how the invention improves the state of transit systems with respect to

8  security. (*See, e.g.*, '730 Patent at col.5 ll.16-19 ("For communication devices of item 5,

9  passenger communication devices can be provided with low transmit power on request to identify

10  the person (if enabled) so as to be able to tell who is in a vehicle or using a rental car."); col.12

11  ll.53-55 ("Security subsystems of the present transit system can identify non-users and criminal

12  activity of passengers thus reducing such irregular activity."); col.14 ll.37-40 ("As people

13  approach the vehicle, the central assigning system can verify that expected persons are present

14  based on received location data of passengers and vehicles."); col.23 ll.30-33 ("Further, [no prior

15  art systems] allow a passenger to electronically identify himself to the system for primary purpose

16  of automatic billing, and also to help with security and dynamic scheduling."); Claim 3(d) ("a

17  wireless means of informing the passenger of the assignment and  updated expected arrival time");

18  Claim 6(c) ("a wireless means of detecting the proximity of the passenger and alerting the

19  passenger of the proximity of the vehicle.").)  In addition, the automated billing provided by the

20  patent augments security because neither the driver nor the passenger need to carry cash or credit

21  cards—a great improvement over the transit systems circa 2000. (*See, e.g.*, '730 Patent at col.16

22  ll.17-38; col.20 ll.29-37; col.23 ll.16-34.)  The ability for the passenger to receive dynamic

23  updates regarding a vehicle's time of arrival and its proximity also provided for amplified security

24  because it provided greater time certainty, shorter wait times, and allowed the customer to obtain

25  dynamic updates regarding the ETA of the vehicle, its current location, and the identity of the

26  vehicle and its driver.  (*See, e.g.*, '730 Patent at col.14 ll.29-40.)  The automated billing provided

27  by the patent enhances security because neither the driver nor the passenger need to carry cash or

28

- 11 -

credit cards.  (*See, e.g.*, '730 Patent at col.16 ll.17-38; col.20 ll.29-37; col.23 ll.16-34.)  Dynamic updates of location and vehicle proximity also enhanced security because passengers reliably knew the ETA of the vehicle, its current location, and the identity of the vehicle and its driver. (*See, e.g.*, '730 Patent at col.14 ll.29-40; Claims 2(b), 2(c), 3(b), 3(c), 6(b), 6(c).)

31.    These novel, security-enhancing features are reflected in the '730 Patent's claims. (*See, e.g.*, '730 Patent at Claim 2(b) ("a plurality of communication devices for providing wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage"); Claim 2(c)("a wireless means of on-demand allocation of a passenger to a specific vehicle through the central data system"); Claim 3(d) ("a wireless means of informing the passenger of the assignment and updated expected arrival time"); Claim 6(c) ("a wireless means of detecting the proximity of the passenger and alerting the passenger of the proximity of the vehicle"); *see also* Claims 3(b); 3(c); 6(b).

32.    The security-enhancing features of the '730 Patent were inventive, and provided greater security for both drivers and passengers.  For example, no prior art transit system provided "a wireless means of detecting the proximity of the passenger and alerting the passenger of the proximity of the vehicle," provided electronic identification, or provided automated billing.  Nor were these features well understood or routine in the industry.  Indeed, in July 2000, 50 yellow cabs in New York City had just begun taking credit cards.  (*See* Ex. E, Edward Wong, Yellow Cabs Start to Take Credit Cards, N.Y. Times, July 14, 2000 (available at https://www.nytimes.com/2000/07/14/nyregion/yellow-cabs-start-to-take-credit-cards.html).) The idea of an automated credit-card-free, cash-free transaction was far beyond the industry's horizon.

33.    The specification explains in detail the need for a convenient billing system for transit systems.  (*See, e.g.*, '730 Patent at col.8 ll.32-34) ("It is another objective of this invention to provide a convenient access and billing system for all modes of travel…").  The specification explains that electronic identification of the passenger will be used for automatic billing.  (*See* '730 Patent at col.23 ll.30-32.)  The patent explains at length the various ways that automatic

- 12 -

billing can occur—via utility-style billing, automatically charged to credit cards, or payment at the time the trip occurs.  (*See, e.g.*, '730 Patent at col.18 ll.43-45; col.18 ll.4-17.)  The specification notes, "[i]t is a great convenience not to need to make payment by cash, tokens, or credit cards each time a trip or segment of trip is made."  ('730 Patent at col.5 ll.42-44.)  The patent's focus on automatic payment—which no prior art transit system provided—is also seen in the patent claims.  The invention's cash-free, credit-card free payment is also seen in the patent's claims.  (*See, e.g.*, claims 2(a) ("distributing periodic invoices"); 1(e) ("a automatic means of billing for the use of the vehicle.")

34.    The specification explains in detail the infrastructure problems and financial burdens with the prior art systems—where so many people individually owned cars.  For example, "retail and establishments and business centers necessitate substantial spacing to accommodate parking for cars."  ('730 Patent at col.1 l.65-col.2 l.6.)  "The largest monthly expense for many families is the cost of acquiring and operating motor vehicles.  Repair costs and insurance add to the financial burdens associated with individual transportation vehicles."  ('730 Patent at col.1 ll.48-53.)  The transit system invented by Professor Dickerson minimizes social costs such as trip times, economic costs, and convenience and "has total economic and social costs that are much less than those associated with conventional mass transit systems[.]"  (*See* '730 Patent at col.6 ll.11-14.)

35.    The invention disclosed in the '730 Patent radically changes the logistics, economic impacts, and efficiencies of the transportation system.  The invention generally is an automated and integrated communications and computing system that uses a central assigning system and handheld devices to provide information between the passengers of the transit system, the vehicles and/or drivers, and the central assigning system itself, which is used to move the passengers between particular originating and destination sites.  "The transit system preferably integrates mass transit needs by providing wireless communications between the passengers of the transit system, the vehicles, and the central assigning system used to move the passengers between particular origination and destination sites."  ('730 Patent at col.3 ll.48-52.)  The

- 13 -

invention of the '730 Patent is a pioneering invention, which has been extensively adopted in ride-hailing and vehicle-sharing services.  As a result, the nature of transportation systems as a whole changed.

36.     The invention allows a passenger to use a hand-carried device to request or locate a vehicle and a central assigning system that tracks the geographic position of all vehicles and passengers in real time, to dispatch a vehicle in response to the passenger's request and/or provide the location of the vehicle to the requestor for the requestor's use.  "The central assigning system is capable of maximizing efficiencies in urban transportation with the information received from and sent to the passengers and vehicles."  ('730 Patent at col.4 ll.6-9.)  "The system provides passengers with the greatest flexibility and convenience consistent with relatively low economic and environmental costs through the use of wireless communications to and from passengers, vehicles and the central assigning system."  ('730 Patent at col.4 ll.9-14.)

37.     All of the communication devices and processors of the invention communicate with each other.  (*See, e.g.*, '730 Patent at col.7 ll.47-64; col.14 ll.29-40; col.16 ll.17-38; col.20 ll.29-37; Table 1, col.21-22 ("Notify Passenger", "Updates"; "Report Position"); Claim 2(c).)  With this dynamic updating and interconnected communications capability, a passenger can move toward a vehicle's location—such as when the vehicle is stuck in traffic in a series of one-way streets—and the system would update the vehicle's and passenger's proximity to one another.

### 5.     The '730 Patent Claims A Unified Ride–And Vehicle–Sharing System.

38.     The '730 Patent includes five independent and one dependent claims.

39.     Independent claim 2 of the '730 Patent is representative.  It claims:

*An automated system for providing unified billing for passenger transport comprising:*

*(a) a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage; and*
*(b) a plurality of communication devices for proving wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage; and*

- 14 -

> *(c) a wireless means of on-demand allocation of a passenger to a specific vehicle through the central data system.*

('730 Patent at Claim 2, col.23 l.62 - col.24 l.23.)

40.     Independent Claim 3 of the '730 Patent is also representative.  Claim 3 reads as follows:

> *An automated system for providing unified billing for passenger transport comprising:*
>
> *(a) a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage; and*
> *(b) a plurality of communication devices for providing wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage;*
> *(c) a wireless means of on-demand allocation of a passenger to a specific vehicle through the central data system; and*
> *(d) a wireless means of informing the passenger of the assignment and updated expected arrival time.*

('730 Patent at Claim 3, col.24 ll.23-37.)

41.     Independent Claim 6 of the '730 Patent is also representative:

> *An automated system for providing unified billing for passenger transport comprising:*
>
> *(a)  a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage; and*
> *(b)  a plurality of communication devices for providing wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage; and*
> *(c)  a wireless means of detecting the proximity of the passenger and alerting the passenger of the proximity of the vehicle.*

('730 Patent at Claim 6, col. 24 ll. 53-65.)

### 6.     Lyft's Rideshare Products And Services Rely On Professor Dickerson's Invention.

42.     Lyft was founded as Zimride in 2007, and then launched as Lyft in 2012.  In its Form S-1 filing with the SEC, Lyft stated that in 2018, it "served over 30 million riders and nearly 2 million drivers, achieving $8.1 billion in Bookings and $2.2 billion in revenue." (Form S-1 Offering Statement for Lyft, Inc., March 1, 2019 at 110 (excerpted and attached hereto as Ex. B); the          full          document          is          available          at

- 15 -

https://www.sec.gov/Archives/edgar/data/1759509/000119312519059849/d633517ds1.htm.)

Lyft claims to have provided more than 1 billion rides using its system in the years 2016 through 2018.  (Ex. B, S-1, at 81.)

43.    Lyft makes, uses, sells, offers for sale, and/or imports into the United States and this District products and services that practice the claims of the '730 Patent, including but not limited to Standard Lyft, Lyft Line, Lyft Shuttle, Lyft Plus, Lyft Premier, Lyft Lux, and Lyft Lux SUV (collectively, the "Accused Ridesharing Products and Services").

44.    The foregoing Accused Ridesharing Products and Services are integrated into a system comprising a technology platform and smartphone applications to connect drivers and passengers:



SECOND AMENDED COMPLAINT
CASE NO. 3:18-CV-07152-JST

(Integrated Screen captures above and in paragraphs 45-47, 51, 55 and 59 below are illustrative of the Lyft App and the Citi Bike mobile app.   (*See, e.g.*, Ex. Q (available at https://www.lifewire.com/lyft-4156217 (last accessed June 14, 2019)).)

45.    A passenger uses the Lyft App to request or locate a ride and, through the Lyft App, a driver accepts the request.   (*See* Ex. F (available at https://help.lyft.com/hc/en-us/articles/115013080028-How-to-give-a-Lyft-ride (last accessed June 11, 2019)).)   When a passenger requests a ride, the Lyft App uses GPS to provide a map and allows the passenger to set a pickup location.   (*See* Ex. G (available at https://help.lyft.com/hc/en-us/articles/115013079988-How-to-request-a-ride (last accessed June 11, 2019)).)

46.     The Lyft App and/or technology platform wirelessly detect the proximity of the passenger and alert the passenger of the proximity of the vehicle.   (*See* Ex. H (available at https://help.lyft.com/hc/en-us/articles/115013080908-How-to-get-picked-up-as-a-passenger (last accessed June 11, 2019)).)   The Lyft App displays the driver's estimated time of arrival and notifies the passenger when the driver is about to arrive.  *Id*.



47.     The Lyft App and/or the technology platform automatically calculate the passenger's fare, and the fare automatically is charged to the payment method linked to the passenger's account and invoiced through that account.   (*See* Ex. I (available at https://help.lyft.com/hc/en-us/articles/115012926507-How-to-pay-for-a-Lyft-ride (last accessed June 11, 2019)).)  A passenger's receipt is automatically emailed to the passenger's email address upon completion of the trip.

- 18 -



48.     Lyft uses a plurality of communication devices—smartphones used by the passengers and drivers, its technology platform, and applications—to provide wireless communication between passengers, vehicles, and a central data system in order to operate its passenger transit system.  *See supra* Ex. F; Ex. H.

49.     Lyft uses a wireless means—the Lyft App and/or other applications running on smartphones—to provide on-demand allocation of a passenger to a specific vehicle through its central data system.  (*See* Ex. J ("Ridesharing matches you with a nearby driver who will pick you up and take you where you want to go.") (available at https://blog.lyft.com/posts/how-does-lyft-work (last accessed June 11, 2019)).)

50.     Once a driver has been assigned to a ride, the Lyft App wirelessly informs the passenger of the assignment and provides information on driver proximity and arrival time.  *See*

*supra* Ex. J ("You'll see a photo of your driver and the car, as well as their ETA.  You can even watch as they approach on a map and call your driver if something changes.").

51.    Once a passenger enters the address or name of his/her destination, the Lyft Driver App will display the suggested route for the driver to take and an estimated time of arrival:



*See* Ex. F.  It can thus be seen that the technology disclosed in Professor Dickerson's '730 Patent is absolutely core to the way in which Lyft operates its business.

### 7.    Lyft's Bikeshare Products And Services Rely On Professor Dickerson's Invention.

52.    Lyft operates bicycle-sharing networks and services in many cities in the United States under various well-known brands, such as "Citibike," Ford GoBike, Divvy, BlueBikes, and Capital Bikeshare.  Using the infrastructure it has deployed—including many thousands of "smart" bicycles, stations, and back-end computer systems—Lyft allows user-passengers to use

- 20 -

their smartphones to arrange for point-to-point transportation using borrowed vehicles (*i.e.*, "smart" bicycles).  Some of the bicycles used in Lyft's bikeshare systems are exclusively pedal-powered, while others are propelled by integrated electric motors.

53.     Lyft's bikeshare services have proven very popular.  In fact, Lyft claims to be the largest bikeshare service in the United States.

54.     Lyft makes, uses, sells, offers for sale, and/or imports into the United States and this District products and services that practice the claims of the '730 Patent, including but not limited to services known as Citibike, Ford GoBike, BlueBikes, Divvy, Capital Bikeshare, Cogo, Biketown, and Niceride (collectively, the "Accused Bikeshare Services").

55.     Each of the foregoing Accused Bikeshare Services are integrated systems comprising a technology platform and smartphone applications to connect riders and vehicles (*i.e.*, the "smart" bicycles).  As an example, a general description of the operation of one of the Accused Bikeshare Services, Citibike, follows:



(*See* Ex. K (available at https://www.citibikenyc.com/how-it-works/app (last accessed June 11, 2019)).)

SECOND AMENDED COMPLAINT
CASE NO. 3:18-CV-07152-JST

56.     A user utilizes the Citi Bike mobile app or a Lyft account to locate a bicycle near where the user intends to start a trip.  (*Id.*; Ex. R (available at https://help.citibikenyc.com/hc/en-us/articles/360002906051-Finding-bikes-docks-in-the-mobile-app   (last   accessed   June   11, 2019)).)   The Citi Bike mobile app uses GPS and the Lyft Bikeshare technology platform to identify the locations of the user and one or more bicycles available for allocation to the user, which may be either "docked" at a fixed station, or simply free-standing in a public area, such as a sidewalk.

57.     The Citi Bike mobile app and Lyft's Bikeshare technology platform wirelessly detect the proximity of the user and alert the user of the proximity of the bicycle or dock station. (*See* Ex. L (available at https://www.citibikenyc.com/how-it-works/docklessbronx (last accessed June 11, 2019)); Ex. S (available at https://help.citibikenyc.com/hc/en-us/articles/360002909251-Do-I-need-to-turn-on-location-services-   (last   accessed   June   11,   2019));   Ex.   T   (available   at https://help.citibikenyc.com/hc/en-us/articles/115003775551-What-is-Ride-Insights-       (last accessed June 11, 2019)).)

58.     The Citi Bike mobile app and Lyft Bikeshare technology platform also allow a user to enter a destination, and inform the user of an estimated time of trip, and, for bicycles that are stored in dock stations, the drop-off location nearest the user's destination.  (*See* Ex. M (available at https://www.citibikenyc.com/how-it-works/rules-of-the-road (last accessed June 11, 2019)); Ex.  U  (available  at  https://help.citibikenyc.com/hc/en-us/articles/360002889132-Planning-a-ride (last accessed June 11, 2019)).)

SECOND AMENDED COMPLAINT
CASE NO. 3:18-CV-07152-JST

59.     Once a user commences a trip on a Citibike bicycle, the Lyft Bikeshare technology platform ensures that the allocated bicycle is not available for allocation to another user.  The bicycle only becomes available for re-allocation once the current user's trip has been completed.

 

60.     The Citi Bike mobile app and/or the Lyft Bikeshare technology platform also "push" notifications and information to a user during a trip, including elapsed time, turn-by-turn directions, location and destination information, trip distance, and trip end confirmation.  (*See* Ex. K; Ex. V (available at https://help.citibikenyc.com/hc/en-us/articles/115007201127-Do-I-need-to-turn-on-push-notifications- (last accessed June 11, 2019)); Ex. T ("[T]he Citi Bike app will use your phone's location to record the route you take between your starting and ending Citi Bike station. . . . When you remove a bike from the dock, the app begins recording your route.  When you dock your bike, the app stops recording any location data after that point.").)

61.     The Citi Bike mobile app and/or the Lyft Bikeshare technology platform automatically calculate the user's fare for the trip, and the fare automatically is charged to the payment method linked to the user's account and invoiced through that account.  (*See* Ex. N (available at https://www.citibikenyc.com/pricing (last accessed June 11, 2019)).)  Trips and

- 23 -

SECOND AMENDED COMPLAINT
CASE NO. 3:18-CV-07152-JST

1    payment receipt info are logged and accessible in a user's account, either through the Citi Bike

2    mobile app or website.  Users have the ability to choose fixed periodic billing (e.g., yearly) if

3    desired.  Users can "[p]urchase a single ride straight from the [Citi Bike] app" or "connect [an]

4    annual membership to [their] Lyft account."  (Ex. K; *see also* Ex. T.)

5        62.    Lyft uses a plurality of communication devices in connection with all of the

6    Accused Bikeshare Services, including Citibike, to provide wireless communication between

7    user-passengers, the smart bicycles, and central data systems in order to operate its passenger

8    transit systems.   These devices include smartphones used by the users and system

9    maintainers/operators, electronic equipment built-in to the bicycles and docking stations to allow

10   for tracking, identification, trip activation/completion, and billing. (Ex. T ("[T]he Citi Bike app

11   will use your phone's location to record the route you take between your starting and ending Citi

12   Bike station. . . . When you remove a bike from the dock, the app begins recording your route.

13   When you dock your bike, the app stops recording any location data after that point.").)

14       63.    Lyft uses a wireless means—applications running on smartphones and other

15   infrastructure—to provide on-demand allocation of users to available bicycles through its central

16   data system.  (*See* Ex. O (available at https://www.citibikenyc.com/how-it-works (last accessed

17   June 11, 2019)).)  Riders can use either the Citi Bike mobile app or directly use their "Lyft account

18   to grab a bike and go."  (Ex. K.)  The technology disclosed in Professor Dickerson's '730 Patent

19   is thus core to the way in which Lyft operates its business.

20           **8.     Lyft Takes Credit For Development Of A Unified Transportation
                      System.**

21       64.    In connection with its recent Initial Public Offering, Lyft filed a Form S-1 with the

22   Securities and Exchange Commission.  (Form S-1 Offering Statement for Lyft, Inc., March 1,

23   2019 (excerpted as Ex. B).)  That document provides further information on Lyft's view of its

24   own corporate history and details regarding its current and future development plans.  It is

25   apparent that Lyft is working to realize the full breadth of Professor Dickerson's "urban transit

26

27

28
                                        - 24 -

1   system" as disclosed and claimed in the '730 Patent.  It also appears that Lyft takes full credit for

2   it.

3        65.     Lyft claims to have "started a movement to revolutionize transportation.  In 2012,

4   we launched our peer-to-peer marketplace for on-demand ridesharing and have continued to

5   pioneer innovations aligned with our mission.  Today, Lyft is one of the largest and fastest-

6   growing <u>multimodal</u> transportation networks in the United States and Canada. To date, we have

7   facilitated over one billion rides."  (Ex B, S-1, at 1 (emphasis added).)  Lyft notes that its

8   "offerings include an expanded set of transportation modes, such as access to a network of shared

9   bikes . . . for shorter rides and first-mile and last-mile legs of multimodal trips.  We also recently

10  added information about nearby public transit routes in select cities to offer riders a robust view

11  of transportation options."  (Ex. B, S-1, at 6.)

12       66.     Lyft shares many of Professor Dickerson's values:  "Our platform enables riders

13  to optimize their journey across a number of factors including time, cost, number of seats, service,

14  comfort and convenience.  True to our pioneering ethos, we are constantly innovating on our

15  platform and unlocking access to new modes of transportation."  (Ex. B, S-1, at 3.)

16       67.     In its Form S-1 filing, while discussing "Monetizing Our Multimodal Platform,"

17  Lyft described the "Ridesharing Marketplace" and then discussed its "Bikes and Scooters,"

18  stating:  "We have a network of shared bikes . . . in select cities to address the needs of riders who

19  value lower-priced, more active and potentially more efficient transportation options for shorter

20  routes.  In 2018, we began to generate revenue from subscription fees and single-use ride fees

21  paid by riders to access our network of shared bikes and scooters."  (Ex. B, S-1, at 78; *see also*

22  Ex. B, S-1, at 6, 104.)

23       68.     Lyft further stated in its Form S-1 filing that its multimodal platform includes the

24  "Ridesharing Marketplace" and Bikes among other services.  (Ex. B, S-1, at 130.)  Regarding the

25  "Ridesharing Marketplace" Lyft asserted:  "Our core offering since 2012 connects drivers with

26  riders who need to get somewhere.  The scale of our network enables us to predict demand and

27  proactively incentivize drivers to be available for rides in the right place at the right time. This

28

- 25 -

allows us to optimize earning opportunities for drivers and offer convenient rides for riders, creating sustainable value to both sides of our marketplace."  *Id.*  Regarding "Bikes and Scooters" it asserted:  "We have a network of shared bikes . . . in a number of cities to address the needs of riders who are looking for lower-priced, more active and often more efficient options for short trips during heavy traffic.  These modes can also help supplement the first mile and last mile of a multimodal trip with public transit."  *Id.*



(Ex. B, S-1, at 130.)

69.    In its offering documents, Lyft disclosed sources for revenue:  "We expect Revenue per Active Rider to continue to increase as we capture more of our riders' transportation spend by driving increased ride frequency by continuing to enhance the experience on our ridesharing marketplace [and] offering additional modes of transportation such as bikes . . . ." (Ex. B, S-1, at 80.)

70.    Notably, Lyft intends to "build the defining brand of our generation and to promote a company culture based on our unique values and commitment to social responsibility."  (Ex. B, S-1, at 2.)

- 26 -

71.     Such revenue offers ample motive for Lyft's willful infringement of the '730 Patent.

## COUNT I

### (Direct Infringement of the '730 Patent Pursuant to 35 U.S.C. § 271(a))

### (Claim 2)

72.     Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 71 of this Complaint as if fully set forth herein.

73.     Defendant has directly infringed, literally or under the doctrine of equivalents, and continues to infringe, Claim 2 of the '730 Patent in this judicial district, in the State of California, and throughout the United States under 35 U.S.C. § 271(a) by making, using, importing, selling, and/or offering for sale in the United States, without license, the Accused Ridesharing Products and Services and the Accused Bikeshare Services.

74.     Claim 2 reads as follows:

*An automated system for providing unified billing for passenger transport comprising:*

> (a)   *a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage; and*
>
> (b)   *a plurality of communication devices for proving wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage; and*
>
> (c)   *a wireless means of on-demand allocation of a passenger to a specific vehicle through the central data system.*

('730 Patent at Claim 2, col.23 l.62-col.24 l.23.)   The specific features that meet these limitations are referenced below.

75.     The Accused Ridesharing Products and Services and the Accused Bikeshare Services are an "*automated system for providing unified billing for passenger transport.*"  (*See* Paragraphs 42-63.)[1]

76.     The Accused Ridesharing Products and Services and the Accused Bikeshare Services comprise "*a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage.*"  (*See* Paragraphs 44-47; 55-61.)

77.     The Accused Ridesharing Products and Services and the Accused Bikeshare Services comprise "*a plurality of communication devices for proving wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage.*"  (*See* Paragraphs 48-51; 62-63.)

78.     The Accused Ridesharing Products and Services and the Accused Bikeshare Services include "*a wireless means of on-demand allocation of a passenger to a specific vehicle through the central data system.*"  (*See* Paragraphs 44-50; 55-59.)

79.     Defendant's infringement of the '730 Patent has injured Plaintiff and will continue to cause severe and irreparable damage as long as Defendant's infringing activities continue.

80.     Plaintiff is entitled to recover damages adequate to compensate it for the injuries complained of herein but, in no event, no less than a reasonable royalty.

## COUNT II

## (Indirect Infringement of the '730 Patent Pursuant to U.S.C. 35 U.S.C. § 271(b))

## (Claim 2)

81.     Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 80 of this Complaint as if fully set forth herein.

82.     As set forth above, Defendant directly infringed the '730 Patent in this judicial district, in the State of California, and throughout the United States.

---

[1] These refer to the averments contained in the referenced paragraphs of this Complaint, *see supra*, which describe and establish infringement by the Lyft Accused Ridesharing Products and Services and the Lyft Accused Bikeshare Services.

83.     Accused Ridesharing Products and Services are "bundled up into a platform" in the form of the Lyft App, the Lyft Rider App, and the Lyft Driver App, all of which allow passengers to contact drivers and others.  (*See* Paragraphs 43-51.)  Lyft induces passengers, drivers, and others to download this platform in the form of a smartphone application to allow drivers and passengers to use the Accused Ridesharing Products and Services.

84.     Similarly, Lyft's Accused Bikeshare Services are "bundled up into a platform" in the form of Lyft's software (*e.g.*, the Citi Bike mobile app), which allows users to connect with shared bicycles.  (*See* Paragraphs 52-63.)  Lyft induces users to download this platform in the form of a smartphone application to allow them to use the Accused Bikeshare Services.

85.     Defendant has indirectly infringed, literally or under the doctrine of equivalents, and continues to infringe, claim 2 of the '730 Patent within this judicial district, in the State of California, and throughout the United States under 35 U.S.C. § 271(b) by inducing, instructing, directing, controlling, advertising, and/or requiring others to directly infringe claim 2 of the '730 Patent, including customers, purchasers, users, developers, passengers, drivers, and users of the Accused Ridesharing Products and Services and the Accused Bikeshare Services.

86.     Defendant's infringement of the '730 Patent has injured Plaintiff and will continue to cause severe and irreparable damage as long as Defendant's infringing activities continue.

87.     Plaintiff is entitled to recover damages adequate to compensate it for the injuries complained of herein but, in no event, no less than a reasonable royalty.

## COUNT III

**(Direct Infringement of the '730 Patent Pursuant to U.S.C. 35 U.S.C. § 271(a))**

**(Claim 3)**

88.     Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89.     Defendant has directly infringed, literally or under the doctrine of equivalents, and continues to infringe, claim 3 of the '730 Patent in this judicial district, in the State of California, and throughout the United States under 35 U.S.C. § 271(a) by making, using,

- 29 -

importing, selling, and/or offering for sale in the United States, without license, infringing

products and services.

90.     Claim 3 of the '730 Patent claims:

*An automated system for providing unified billing for passenger transport comprising:*

(a)     *a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage; and*

(b)     *a plurality of communication devices for providing wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage;*

(c)     *a wireless means of on-demand allocation of a passenger to a specific vehicle through the central data system; and*

(d)     *a wireless means of informing the passenger of the assignment and updated expected arrival time.*

('730 Patent at Claim 3, col.24 ll.23-35.)  The specific features that meet these limitations are

set forth below.

91.     The Accused Ridesharing Products and Services and the Accused Bikeshare

Services comprise an "*automated system for providing unified billing for passenger transport.*"

(*See* Paragraphs 42-63.)

92.     The Accused Ridesharing Products and Services and the Accused Bikeshare

Services provide "*a central data system for tracking passenger transportation vehicle usage and

distributing periodic invoices for the usage.*"  (*See* Paragraphs 44-47; 55-61.)

93.     The Accused Ridesharing Products and Services and the Accused Bikeshare

Services comprise "*a plurality of communication devices for providing wireless communication

between passengers, vehicles, and the central data system in connection with the passenger

transportation vehicle usage.*"  (*See* Paragraphs 48-51; 62-63.)

94.     The Accused Ridesharing Products and Services and the Accused Bikeshare

Services comprise "*a wireless means of on-demand allocation of a passenger to a specific vehicle

through the central data system.*"  (*See* Paragraphs 44-50; 55-59.)

95.     The Accused Ridesharing Products and Services and the Accused Bikeshare

Services comprise "*a wireless means of informing the passenger of the assignment and updated

expected arrival time.*"  (*See* Paragraphs 44-46; 57-63.)

96.     Defendant's infringement of the '730 Patent has injured Plaintiff and will continue to cause severe and irreparable damage as long as Defendant's infringing activities continue.

97.     Plaintiff is entitled to recover damages adequate to compensate it for the injuries complained of herein but, in no event, no less than a reasonable royalty.

## COUNT IV

### (Indirect Infringement of the '730 Patent Pursuant to U.S.C. 35 U.S.C. § 271(b))

### (Claim 3)

98.     Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.     As set forth above, Defendant directly infringed, and continues to infringe, claim 3 of the '730 Patent.

100.    Lyft's Accused Ridesharing Products and Services are "bundled up into a platform" in the form of the Lyft App, the Lyft Rider App, and the Lyft Driver App, all of which allow passengers to contact drivers and others.  (*See* Paragraphs 43-51.)  Lyft induces passengers, drivers, and others to download this platform in the form of a smartphone application to allow drivers and passengers to use the Accused Ridesharing Products and Services.

101.    Similarly, Lyft's Accused Bikeshare Services are "bundled up into a platform" in the form of Lyft's software (*e.g.*, the Citi Bike mobile app), which allows users to connect with shared bicycles.  (*See* Paragraphs 52-63.)  Lyft induces users to download this platform in the form of a smartphone application to allow them to use the Accused Bikeshare Services.

102.    Defendant has indirectly infringed, literally or under the doctrine of equivalents, and continue to infringe, claim 3 of the '730 Patent within this judicial district, in the State of California, and throughout the United States under 35 U.S.C. § 271(b) by inducing, instructing, directing, controlling, advertising, and/or requiring others to directly infringe, without license, claim 3 of the '730 Patent, including customers, purchasers, users, developers, passengers, drivers, and users of the Accused Ridesharing Products and Services and the Accused Bikeshare Services.

103.   Defendant's infringement of the '730 Patent has injured Plaintiff and will continue to cause severe and irreparable damage as long as Defendant's infringing activities continue.

104.   Plaintiff is entitled to recover damages adequate to compensate it for the injuries complained of herein but, in no event, no less than a reasonable royalty.

## COUNT V

**(Direct Infringement of the '730 Patent Pursuant to 35 U.S.C. § 271(a))**

**(Claim 6)**

105.   Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.   Defendant has directly infringed, literally or under the doctrine of equivalents, and continues to infringe, claim 6 of the '730 Patent in this judicial district, in the State of California, and throughout the United States under 35 U.S.C. § 271(a) by making, using, importing, selling, and/or offering for sale in the United States, without license, infringing products and services.

107.   Claim 6 of the '730 Patent reads as follows:

> *An automated system for providing unified billing for passenger transport comprising:*
>
> (a)   *a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage; and*
>
> (b)   *a plurality of communication devices for providing wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage; and*
>
> (c)   *a wireless means of detecting the proximity of the passenger and alerting the passenger of the proximity of the vehicle.*

('730 Patent at Claim 6, col.24 ll.53-65.)  The specific features that meet these limitations are set forth below.

108.   The Accused Ridesharing Products and Services and the Accused Bikeshare Services comprise an "*automated system for providing unified billing for passenger transport.*" (*See* Paragraphs 42-63.)

- 32 -

109.    The Accused Ridesharing Products and Services and the Accused Bikeshare Services comprise an "*a central data system for tracking passenger transportation vehicle usage and distributing periodic invoices for the usage*."  (*See* Paragraphs 44-47; 55-61.)

110.    The Accused Ridesharing Products and Services and the Accused Bikeshare Services comprise "*a plurality of communication devices for providing wireless communication between passengers, vehicles, and the central data system in connection with the passenger transportation vehicle usage*."  (*See* Paragraphs 48-51; 62-63.)

111.    The Accused Ridesharing Products and Services and the Accused Bikeshare Services comprise an "*a wireless means of detecting the proximity of the passenger and alerting the passenger of the proximity of the vehicle*."  (*See* Paragraphs 44-51; 56-61.)

112.    Defendant's infringement of the '730 Patent has injured Plaintiff and will continue to cause severe and irreparable damage as long as Lyft's infringing activities continue.

113.    Plaintiff is entitled to recover damages adequate to compensate it for the injuries complained of herein but, in no event, no less than a reasonable royalty.

## COUNT VI

### (Indirect Infringement of the '730 Patent Pursuant to U.S.C. 35 U.S.C. § 271(b))

### (Claim 6)

114.    Plaintiff hereby incorporates by reference the allegations of Paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.    As set forth above, Defendant directly infringed and continues to infringe Claim 6 of the '730 Patent within this judicial district, in the State of California, and throughout the United States.

116.    Lyft's Accused Ridesharing Products and Services are "bundled up into a platform" in the form of the Lyft App, the Lyft Rider App, and the Lyft Driver App, all of which allow passengers to contact drivers and others.  (*See* Paragraphs 43-51.)  Lyft induces passengers, drivers, and others to download this platform in the form of a smartphone application to allow drivers and passengers to use the Accused Ridesharing Products and Services.

117.   Similarly, Lyft's Accused Bikeshare Services are "bundled up into a platform" in the form of Lyft's Bikeshare software (*e.g.*, the Citi Bike mobile app), which allows users to connect with shared bicycles.  (*See* Paragraphs 52-63.)  Lyft induces users to download this platform in the form of a smartphone application to allow them to use the Accused Bikeshare Services.

118.   Defendant has indirectly infringed, literally or under the doctrine of equivalents, and continue to infringe claim 6 of the '730 Patent within this judicial district, in the State of California, and throughout the United States under 35 U.S.C. § 271(b) by inducing, instructing, directing, controlling, advertising, and/or requiring others to directly infringe, without license, claim 6 of the '730 Patent, including customers, purchasers, users, developers, drivers, and users of the Accused Ridesharing Products and Services and the Accused Bikeshare Services.

119.   Defendant's infringement of the '730 Patent has injured Plaintiff and will continue to cause severe and irreparable damage as long as Defendant's infringing activities continue.

120.   Plaintiff is entitled to recover damages adequate to compensate it for the injuries complained of herein but, in no event, no less than a reasonable royalty.

## DEMAND FOR JURY TRIAL

121.   Plaintiff demands that all issues be determined by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment in its favor and against Defendant and respectfully request the following relief:

A.   A judgment declaring that Defendant has infringed, either literally or under the doctrine of equivalents, one or more claims of U.S. Patent No. 6,697,730;

B.   A finding that Defendant's infringement of the '730 Patent has been willful and a judgment for enhanced damages;

C.   A judgment awarding Plaintiff damages adequate to compensate for Defendant's infringement;

D.   Pre-judgment and post-judgment interest to the full extent allowed under the law, as well as its costs;

E.   Attorneys' fees in this action as an exceptional case pursuant to 35 U.S.C. § 285;

- 34 -

1      F.      Costs and expenses in this action; and

2      G.      Such other and further relief as the Court deems just and proper.

3    Respectfully submitted,

4

5    Dated:  June 14, 2019                    */s/ Jeffrey J. Toney*
                                              Jeffrey J. Toney (*admitted pro hac vice*)
6                                             Ralph E. Gaskins (*admitted pro hac vice*)
                                              Jackie L. Toney (*admitted pro hac vice*)
7                                             Paul G. Williams (*admitted pro hac vice*)
                                              KASOWITZ BENSON TORRES LLP
8                                             1349 West Peachtree Street, N.W., Suite 1500
                                              Atlanta, Georgia 30309
9                                             Telephone:  (404) 260-6080
                                              Facsimile:  (404) 260-6081
10                                            jtoney@kasowitz.com
                                              rgaskins@kasowitz.com
11                                            jatoney@kasowitz.com
                                              pwilliams@kasowitz.com
12
                                              Lyn R. Agre (SBN 178218)
13                                            Margaret A. Ziemianek (SBN 233418)
                                              KASOWITZ BENSON TORRES LLP
14                                            101 California Street, Suite 2300
                                              San Francisco, California 94111
15                                            Telephone:  (415) 421-6140
                                              Facsimile:  (415) 398-5030
16                                            lagre@kasowitz.com
                                              mziemianek@kasowitz.com
17
                                              *Attorneys for Plaintiff RideApp, Inc.*
18

19

20

21

22

23

24

25

26

27

28

- 35 -
SECOND AMENDED COMPLAINT
CASE NO. 3:18-CV-07152-JST